UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KRAIG SIPPELL *ex rel.*
ESTATE OF DAWN PALMER,

      Plaintiff,

v.

ALLSTATE INSURANCE
COMPANY, *et al.*,

      Defendants.
_____/

Civil Action No. 24-11853

David R. Grand[1]
United States Magistrate Judge

## OPINION & ORDER ON DEFENDANTS' SUMMARY JUDGMENT MOTIONS (ECF Nos. 41, 53) AND ON PLAINTIFF'S MOTION TO AMEND THE SCHEDULING ORDER (ECF No. 55)

**Background**

On January 29, 2020, Dawn Palmer ("Palmer") was severely injured in a car accident. Allstate Insurance Company ("Allstate") is the first-party no-fault insurance carrier providing benefits to Palmer pursuant to a claim she filed under her auto insurance policy. Palmer was prescribed 24/7 attendant care by her treating physician, Dr. Parmod Mukhi, and she eventually moved into a residential facility in Davison, Michigan, operated by Charter Senior Living Davison, LLC ("Charter"), with their relationship being governed by a "Michigan Adult Foster Care" "Resident Agreement" (the "Agreement").[2]

---

[1] The parties have consented to the undersigned exercising jurisdiction over all proceedings in this civil action pursuant to 28 U.S.C. § 636(c). (ECF No. 31).

[2] The parties' original Agreement is not in the record, though a later one, executed in mid-December 2023, is. (ECF No. 41-3).

Palmer resided at Charter for over three years, during which time Allstate paid "all of the bills submitted by Charter []." In April 2024, Allstate stopped paying, though the parties dispute why. Palmer claims that when Allstate stopped making payments, it indicated it was doing so because it hadn't "received appropriate documentation" *from Charter* about the services it was providing to Palmer. Allstate, on the other hand, appears to claim that it stopped paying because it learned that Palmer no longer needed Charter's services.[3]

Palmer nevertheless remained at Charter, with Charter not being paid by either Allstate or Palmer. Charter issued Palmer a letter threatening to "evict her on July 20, 2024, for non-payment of outstanding bills . . ." On July 12, 2024, Palmer, through a conservator, Kraig Sippell, filed a lawsuit in the Genesee County Circuit Court against both Charter and Allstate, which was later removed to this Court. Principally, Palmer claims that Charter breached the Agreement by failing to "submit appropriate billing to Allstate which [] resulted in Allstate's failure to pay [Charter] and a resultant decision by Charter to evict [] Palmer for non-payment of bills." (ECF No. 1, PageID.16). Palmer also sought an injunction against Charter, preventing it from evicting her. (*Id.*, PageID.17). As to Allstate, Palmer claims that "[t]he Michigan No-Fault Act does not require the documentation Allstate indicates that it needs in order to pay the bill," and that Allstate violated the No-Fault Act "by refusing to pay a bill which has been incurred and submitted . . ." (*Id.*, PageID.16).

---

[3] The Court notes that it is unclear from the record exactly when and how Allstate learned of that purported fact.

On July 29, 2024, Palmer fell out of her wheelchair while playing a virtual boxing game with her son while visiting him, and was admitted to the hospital. (ECF No. 53-5). As a result of that fall, she fractured her hip, which she promptly addressed surgically. (*Id.*). She thereafter returned to Charter, and "in late 2024" was moved by Charter to a different room, ostensibly because "Charter was performing scheduled room renovations" at that time.[4] She remained at Charter until she vacated her unit on January 18, 2025.

Charter brought a counterclaim against Palmer, her conservator (Sippell), and Palmer's son (Lee Macko) for failing to pay its invoices. Allstate also brought a counterclaim seeking a declaratory judgment that:

> (i) It is not reasonable or necessary for Dawn Palmer to maintain her residence at Charter Senior Living Davison, LLC when Charter does not provide any care to Dawn Palmer and Dawn Palmer does not require the level of care that Charter provides;
>
> (ii) Since Dawn Palmer's residence at Charter is not reasonable or necessary for Dawn Palmer's care, recovery or rehabilitation, any charges assessed by Charter are not allowable expenses as defined by MCL 500.3107; and
>
> (iii) Allstate is entitled to recovery from Sippell as conservator for the Estate of Dawn Palmer for benefits paid to Charter since January 2023 of an amount not less than $100,000.00 under a mistake of fact, believing that Sippell had accurately portrayed and represented the level of care required for Dawn Palmer due to the extent of her injuries from the motor vehicle accident when in fact, Dawn Palmer did not require the level of care provided by Charter and Charter was not providing the care billed to Allstate.
>
> (iv) Allstate is entitled to recovery of from Sippell as Conservator for the Estate of Dawn Palmer for benefits paid for ordinary expenses at Charter that were not reasonably necessary for Dawn

---

[4] While Charter asserts it moved Palmer due to "room renovations," in somewhat contradictory fashion it also admits that "[d]uring this time, Charter decided to rent Palmer's former room to another individual who would pay the required fees . . ." (ECF No. 41-4, PageID.634).

3

> Palmer's care, recovery or rehabilitation, including private patio fees, meal delivery services and housekeeping.

(ECF No. 30, PageID.475-76).

Allstate also brought a counterclaim related to Palmer's July 2024 hip injury. As to that matter, Allstate seeks a declaratory judgment that:

> A. … Dawn Palmer's claim for no-fault benefits for injuries sustained as a result of the July 29, 2024 fall did not arise out of the use of a motor vehicle as a motor vehicle.
>
> B. … Allstate does not have a statutory or contractual obligation under the relevant policy of insurance, or MCL 500.3105(1) to tender payment for Dawn Palmer's care, recovery or rehabilitation incurred as a result of the July 29, 2024 fall.

(*Id.*, PageID.480).

Charter now seeks summary judgment on its counterclaim that Palmer's failure to pay breached the Agreement, and on Palmer's claim that Charter breached the Agreement. (ECF No. 41).[5] Allstate seeks summary judgment as to Palmer's claims against it and asks the Court to enter an order on its counterclaims, "declaring that Allstate does not have a statutory obligation under the No-Fault Act or the relevant policy of insurance[6] to tender payment for Dawn Palmer's residency at Charter, or for medical treatment and care related to Dawn Palmer's July 29, 2024 fall." (ECF No. 53, PageID.1098) (footnote added). For her part, in addition to noting in her summary judgment briefing that she had not received

---

[5] Charter also seeks summary judgment on Palmer's claim for injunctive relief to stop Charter from evicting her. (ECF No. 41-1, PageID.577-79). As there is no dispute that Palmer no longer resides at Charter, the Court agrees with Charter that this claim is now moot and thus subject to dismissal. Accordingly, the Court will grant this aspect of Charter's motion.

[6] As the Court noted at the hearing, Allstate did not attach a copy of the salient insurance policy to its motion papers. Accordingly, there is no basis for the Court grant relief "under" the policy.

4

needed discovery (*e.g.*, ECF No. 42, PageID.719-20; ECF No. 56, PageID.1318), Palmer filed a motion to extend the discovery deadline to complete additional discovery. (ECF No. 55). The motions have been fully briefed, and the Court heard oral argument on June 5, 2025 (as to Charter's motion only), and on October 29, 2025 (as to all three motions).

For the detailed reasons stated on the record and below, the Court will deny Charter's and Allstate's summary judgment motions without prejudice, except that the Court will grant Charter's motion to the extent it seeks to dismiss Palmer's claim for an injunction preventing any eviction proceedings, and will grant Allstate's motion to the extent it seeks a declaration that Allstate does not have a statutory obligation under the No-Fault Act to tender payment for medical treatment and care related *directly* to Dawn Palmer's July 29, 2024 fall. The Court will also grant Palmer's motion to amend the scheduling order.

**<u>Applicable Legal Standards</u>**

Pursuant to Federal Rule of Civil Procedure 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011). A fact is material if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir.

5

2006).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (internal quotations omitted).

Where the movant has the burden of proof at trial, it discharges its initial summary-judgment burden by "show[ing] that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Trs. of Iron Workers Defined Contribution Pension Fund v. Next Century Rebar, LLC*, 115 F.4th 480, 489 (6th Cir. 2024) (quoting *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001)). If the movant discharges its burden, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial" to avoid summary judgment. *Matsushita*, 475 U.S. at 587.

**Discussion**

***Charter's Summary Judgment Motion (ECF No. 41)***

In October 2024, Charter filed counterclaims against Sippell (in his capacity as Palmer's conservator), Palmer, and Macko. (ECF No. 29). Charter claimed that Palmer and Macko breached the Agreement by failing to pay its invoices after Allstate stopped paying, and that they were jointly and severally liable for damages.[7]

In response, Palmer pleads a few affirmative defenses, including that "[a]ny alleged breach of contract is the result of Charter breaching the agreement and … failing to honor [the] implied covenant of good faith and fair dealing" and that "Charter has breached its agreement by failing to properly send resident invoices to Allstate Insurance where it was accepting payment for residence fees and its services from Allstate under the No Fault Act." (ECF No. 35, PageID.529).

Charter now moves for summary judgment on its counterclaim that Palmer breached the Agreement. Charter seeks $65,173.60 in damages, the amount of unpaid costs it has invoiced for Palmer's residency at the facility. Charter also seeks judgment on Palmer's claim that it breached the implied covenant of good faith and fair dealing.

---

[7] Charter also claimed that Palmer and Macko had been unjustly enriched and had breached an implied contract, and sought an order of "equitable eviction" directing Palmer to vacate its facility. (ECF No. 29, PageID.370.) And Charter sought damages "plus interest, costs, and reasonable attorney fees." (*Id.* at 370.) However, Charter did not address these claims and issues in its motion and thus appears to have abandoned them. And, as the Court explained at the hearing, there is, at a minimum, a clear question of fact as to whether Macko is liable to Charter under the Agreement because the body of the Agreement identifies only Palmer as a "financially responsible party." Moreover, because Charter sues Sippell in his capacity as Palmer's conservator, Palmer is the real party in interest with respect to Charter's claims against Sippell. Thus, for ease, the Court will address Charter's motion only as it relates to Palmer.

7

As discussed at the hearing, the Court finds that Palmer is entitled to additional discovery including regarding the parties' discussions surrounding the Agreement's execution, as well as Charter's billings and communications with Allstate. To that end, the Court highlights the following:

- The parties' original agreement and correspondence is not in the record, and Palmer contends that there had been discussions between the parties (the timing of which is unclear) and an agreement about how billing would work.

- Nor does the record contain the *contemporaneous* billings sent to Allstate, which is apparent because the bills in the record bear dates near when the documents were filed with the Court rather than when they were first generated. (*E.g.*, ECF No. 41-5, PageID.637) (showing a payment due date of "3/10/25"). While the Court has no reason to believe the contemporaneous invoices will themselves be any different than what is in the record, Palmer has the right to assure herself that that is the case and, perhaps more importantly given the nature of the parties' dispute, to determine whether the contemporaneous invoices were accompanied by any other communications. Thus, discovery is warranted on those issues.[8] (*See, e.g.*, ECF No. 42, PageID.720) (requesting discovery "related to the [Agreement], Charter's billing practices, the specific invoices sent by Charter to Allstate, and information requested by Allstate that Charter failed to provide.").

- While the Agreement identifies Palmer as the "Financially Responsible Party" "who agrees to be financially responsible for all or any part of the applicable charges," the Agreement's provision regarding the actual billing of invoices is vague. Indeed, it merely provides, "A monthly invoice will contain the Resident's Monthly Fees." It makes no representations about how or to whom the bills will be sent, and that is despite Charter's admission that it is not unusual for it to receive payments directly from third-party insurers. Moreover, Palmer's claim centers around Charter's alleged failure to provide certain billing information to Allstate, making Palmer's need for discovery on those matters before having to face Charter's summary judgment motion all the more acute. The Court also notes the vagueness of Allstate's position as to how and when it determined that Palmer no longer required Charter's services, which is another potentially related topic on

---

[8] The Court notes that Charter filed its summary judgment motion only four days after the parties had agreed to extend the discovery deadline in this case. (ECF No. 40).

8

which additional discovery is warranted.

For all of these reasons, **IT IS ORDERED** that Charter's motion for summary judgment **(ECF No. 41)** is **DENIED WITHOUT PREJUDICE** except that the motion is **GRANTED** as to Palmer's request for an injunction against any eviction proceedings because that issue is now moot.

### *Allstate's Summary Judgment Motion (ECF No. 53)*

Allstate admits that as a result of the serious injuries Palmer sustained in the January 29, 2020 motor vehicle accident, it "became obligated to pay Michigan no-fault benefits for [her] care, recovery, and rehabilitation pursuant to a policy of automobile insurance and MCL 500.3101, *et seq*. of the Michigan Automobile No-Fault Insurance Act." (ECF No. 53, PageID.1081). Allstate also admits that it "paid for [] Palmer's residency at Charter from June 2021 until April 2024," but, importantly, it does not provide any details about how or when it made the determination to cease paying her Charter invoices. Allstate now moves for summary judgment as to both Palmer's claim and its counterclaims for declaratory relief, arguing that "Palmer is not entitled to payment for ordinary, residential expenses that she incurred while living at Charter, nor is Palmer entitled to payment for her medical treatment, care and rehabilitation related to the July 29, 2024 incident resulting in the broken hip because her hip fracture did not arise out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle. MCL 500.3105(1)." (*Id.*, PageID.1086).

9

> *i.  "Care, Recovery, and Rehabilitation" vs. "Ordinary, Residential" Expenses*

Allstate's motion first asks the Court to find that Palmer "cannot establish that [her] residency fees at Charter are compensable under MCL 500.3107(1)(a)," which provides, in relevant part, that "personal protection insurance benefits" are payable for "(a) Allowable expenses consisting of reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation." (ECF No. 53, PageID.1087). Allstate argues that this is so because the expenses it is being asked to pay for Palmer's stay at Charter were not "for [her] care, recovery, or rehabilitation," but rather were merely "ordinary, residential expenses that she incurred while living at Charter." (ECF No. 53, PageID.1086).

Allstate's motion fails on the present record in a few related respects. First, Allstate's motion speaks in sweeping terms about her "residency fees" not being "compensable" under MCL 500.3107(1)(a) of the No-Fault Act. (*Id.*, PageID.1087). But Allstate does not even appear to be arguing that it should recover 100% of all the fees it paid to Charter on Palmer's behalf. More precision is thus required about exactly what fees Allstate is claiming it was not required to pay, and, more importantly, *when*, *why*, and on *what information*, its obligation to pay those fees ceased.

Second, Allstate's argument appears to rest in large part on the affidavit of Charter employee Cynthia Smith, who avers that Palmer "recovered from her auto injury and was highly independent," and that as of October 2023, Charter provided Palmer nothing but "residency and meals." (ECF No. 41-4, PageID.632). But at her deposition, Smith testified

10

to a lack of personal knowledge about much of the care Palmer did and did not receive from Charter staff while she resided there and agreed that Charter's nurses would know about those matters. (ECF No. 56-3, PageID.1387-91, 1404-13). This again speaks to the need for additional discovery on those issues. (ECF No. 56, PageID.1317-18).

Moreover, Palmer presented evidence, both from Charter's records and her own doctors, that appears to be at odds with Smith's averments regarding her capabilities and the care she received. For example, on December 9, 2023, Charter employee Marissa Shefsky noted that Palmer needed assistance with getting dressed, as she could not grip with her right arm, and that she also needed assistance transferring to her wheelchair. (ECF No. 56-3, PageID.1425-27; ECF No. 56-10).

Records from Palmer's doctors also appear to paint a very different picture than the one gleaned from Smith's averments. For example, Dr. Parmed Mukhi, certified monthly, including throughout 2024 and well into 2025, that she "needs help taking care of []her own personal needs … 24 hours a day, 7 days per week." (ECF No. 56-6, 1547-74.) And, in April 2024, while Palmer was still residing at the facility, a licensed phycologist, Dr. Nida Hamid, found that Palmer "has ongoing challenges that affect various aspects of her daily life." (ECF No. 56-5, PageID.1540). Palmer has trouble "switch[ing] between thinking about different concepts"; "forming and retaining information"; "recognizing stimuli through touch"; "perform[ing] fine motor tasks"; "perform[ing] tasks requiring visual coordination"; and "recognizing her fingers on both hands." (*Id.*). Again, the Court agrees with Palmer that "further discovery regarding the attendant care Ms. Palmer received [at Charter] is necessary . . ." (ECF No. 56, PageID.1306).

11

Finally, Allstate's motion fails to appreciate the context in which the challenged fees arise, a residential care setting that operates as an "Adult Foster Care Large Group Home . . . that provides 24-hour personal care, protection, and supervision for individuals who are developmentally disabled, mentally ill, physically handicapped, or aged who cannot live alone but who do not need continuous nursing care." (ECF No. 41-3, PageID.587). Allstate argues that Charter's "$6,178.00 [monthly] fee included a room, microwave, fridge, telephone line, cable and internet," as well as "laundry, housekeeping, and meals." (ECF No. 53, PageID.1088). Citing *Admire v. Auto-Owners Ins. Co.*, 494 Mich. 10 (2013), Allstate characterizes all of those as "ordinary, everyday expenses which are incurred by all individuals, injured or otherwise," and thus it concludes they are for her everyday living, not her "care." But as explained in *Admire*, "[a]n 'integrated' product or accommodation involves the blending of an ordinary expense with one that is for the injured person's care, recovery, or rehabilitation in a way that the resulting product or accommodation cannot be separated easily into unit costs," and a residential care facility that provides services to individuals like Palmer who suffered catastrophic injuries which they are learning to manage would seem, at least in large part, to constitute such an integrated product. And, *Admire* held that "MCL 500.3107(1)(a) requires the insurer to cover a truly integrated product or accommodation in full because the entire expense, including the portions that might otherwise be considered ordinary, is necessary for the injured person's care, recovery, or rehabilitation." *Id.* At any rate, the issue highlights the interplay between the individual's required level of care and the level of care provided by the facility in question, and as explained above, those are issues on which additional

12

discovery would be beneficial.

Accordingly, **IT IS ORDERED** that Allstate's motion for summary judgment **(ECF No. 53)** is **DENIED WITHOUT PREJUDICE** to the extent it requests a declaration that "the costs for [] Palmer's residency at Charter are not 'allowable expenses' but rather 'ordinary, everyday products, services or accommodations,' which are not compensable under MCL 500.3107(1)(a)."[9]

### ii. July 2024 Virtual Boxing Game Fall

The last issue before the Court is Allstate's argument that it "is not obligated to provide benefits for Palmer's care as a result of the July 29, 2024 hip fracture unrelated to the January 29, 2020 automobile accident." (ECF No. 53, PageID.1091). Allstate seeks a declaration "that [it] does not have a statutory obligation under the No-Fault Act [] to tender payment . . . for medical treatment and care related to Dawn Palmer's July 29, 2024 fall" that occurred while she was playing a virtual boxing game with her son. (ECF No. 53, PageID.1098). Allstate's argument is based on MCL 500.3105(1), which provides, "(1) Under personal protection insurance an insurer is liable to pay benefits for accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle, subject to the provisions of this chapter." In short, Allstate argues that Palmer's July 2024 fall is "too remote and too attenuated from the use of a motor vehicle as a motor vehicle to permit a finding of causal connection," that is, that the fall "arose out

---

[9] In light of this ruling, the Court need not address at this time Allstate's argument that Palmer is not entitled to "replacement services" more than three years after the motor vehicle accident. (ECF No. 53, PageID.1090).

13

of" her 2020 motor vehicle accident. (ECF No. 53, PageID.1098). The Court agrees.

Allstate relies principally on two cases, *McPherson v. McPherson*, 493 Mich. 294 (2013) and *Kovach v. Citizens Ins. Co.*, No. 359474, 2023 WL 2334352 (Mich. App. Mar. 2, 2023), both of which are instructive.

In *McPherson*, the plaintiff developed a neurological disorder as a result of injuries he sustained in a 2007 motor vehicle accident. Subsequently, in 2008, while driving a motorcycle, he experienced a seizure consistent with that disorder, lost control of the motorcycle, crashed, and sustained a severe spinal cord injury. The plaintiff claimed he was entitled to no-fault benefits for the spinal cord injury not as a result of the 2008 motorcycle crash, but rather as a result of his 2007 accident. In short, he claimed that his 2008 spinal cord injury "arose out of" the 2007 accident for purposes of MCL 500.3105(1). The trial court granted summary disposition in favor of plaintiff's insurer, and that ruling was affirmed by the Michigan Court of Appeals. Plaintiff appealed to the Michigan Supreme Court, which upheld the ruling, explaining:

> . . . the only question here is whether the *spinal cord injury* plaintiff suffered in the 2008 crash "ar[ose] out of" the 2007 accident for purposes of MCL 500.3105(1).
>
> Pursuant to MCL 500.3105(1), a PIP provider is liable "to pay benefits for accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle...." In *Griffith v. State Farm. Mut. Auto. Ins. Co.,* 472 Mich. 521, 531, 697 N.W.2d 895 (2005), this Court explained this causal requirement:
>
> [A]n insurer is liable to pay benefits for accidental bodily injury only if those injuries "aris[e] out of" or are caused by "the ownership, operation, maintenance or use of a motor vehicle...." It is not *any* bodily injury that triggers an insurer's liability under the no-fault act. Rather, it is only those injuries that are caused by the insured's use of

14

> a motor vehicle.
>
> Regarding the degree of causation between the injury and the use of the motor vehicle that must be shown, this Court has established that an injury arises out of the use of a motor vehicle as a motor vehicle when "the causal connection between the injury and the use of a motor vehicle as a motor vehicle is more than incidental, fortuitous, or 'but for.'" *Thornton v. Allstate Ins. Co.,* 425 Mich. 643, 659, 391 N.W.2d 320 (1986).
>
> In this case, the causal connection between the 2008 spinal cord injury and the 2007 accident is insufficient to satisfy the "arising out of" requirement of MCL 500.3105(1). ***Plaintiff did not injure his spinal cord while using the vehicle in 2007.*** Rather, ***he injured it in the 2008 motorcycle crash***, which was ***caused by his seizure***, which was ***caused by his neurological disorder***, which was ***caused by his use of a motor vehicle*** as a motor vehicle ***in 2007***. Under these circumstances, we believe that the 2008 injury is simply too remote and too attenuated from the earlier use of a motor vehicle to permit a finding that the causal connection between the 2008 injury and the 2007 accident "is more than incidental, fortuitous, or 'but for.'" *Thornton,* 425 Mich. at 659, 391 N.W.2d 320.

*McPherson*, 493 Mich. at 295-98 (bold italics added).

In addressing the lone dissenter's contention that the plaintiff's 2008 accident was "an inextricable aspect of his seizure," the majority found that contention focused on the wrong connection. As the majority explained, even if "plaintiff's second seizure and resultant fall came about as a result of the neurological disorder suffered in the first accident, it does not follow, as the dissent concludes, that 'the 2008 *injuries* were an inextricable result of [plaintiff's] seizure disorder' as well. [] ***Indeed, had plaintiff been in bed or on the couch when he had the seizure, the 'inextricable' injury would not have occurred.***" *Id.*, at 298 (bold italics added).

*Kovach* is similar to *McPherson* both factually and analytically. In *Kovach*, the

15

plaintiff suffered injuries on February 26, 2020, when a car he was in was rear-ended by a motor vehicle driven by another person. Plaintiff was diagnosed with a concussion, but a CT scan of his head did not reveal any hemorrhages or other abnormalities, though an MRI of plaintiff's neck taken one month later revealed a "[s]ignificant attenuated flow void involving plaintiff's right vertebral artery." Plaintiff suffered three falls in May 2020, and during the last one he struck his head on the wall "pretty hard." His headaches worsened and on July 2, 2020, a CT scan of his head "revealed a right subdural hematoma" that plaintiff contended "was caused when he struck his head against the wall." A few weeks later, the plaintiff had surgery to evacuate the hematoma.

The plaintiff sued his first-party insurance company for personal protection insurance benefits, and the insurer moved for partial summary disposition arguing that because plaintiff's subdural hematoma was caused by his May 2020 fall, it was too far removed from the February 2020 car accident to satisfy MCL 500.3105(1)'s "arising out of the ownership, operation, maintenance or use of a motor vehicle" language. The trial court agreed and the plaintiff appealed. The Michigan Court of Appeals affirmed. After noting that *McPherson* "controls" and reciting the straightforward facts and holding of that case, the Court of Appeals went on to explain:

> In both *McPherson* and this case, a second incident caused the relevant injury. Here, plaintiff did not suffer a subdural hematoma in the motor vehicle accident. Rather, he developed the hematoma after falling and hitting his head, which was caused by his vertigo, which was caused by his use of a motor vehicle in February 2020. In other words, the facts alleged by plaintiff only support a finding that the "first *injury* directly caused the second *accident*, which in turn caused the second injury." *McPherson*, 493 Mich at 298-299.

16

> Under *McPherson*, there is not a sufficient connection between the subdural hematoma and the motor vehicle accident. ***Even if plaintiff's fall was caused by vertigo caused by the motor vehicle accident, the accident would not be more than an incidental, fortuitous, or "but for" cause of his subdural hematoma***. Therefore, plaintiff's subdural hematoma did not "arise out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle" pursuant to MCL 500.3105(1).

*Kovach*, 2023 WL 2334352, at *2-3.

*McPherson* and *Kovach* are on all fours with the facts of this case. Just as McPherson did not injure his spinal cord in the first car accident, and Kovach did not suffer a hematoma in the first car accident, Palmer did not fracture her hip during the February 2020 car accident. Rather, she injured her hip *more than four years later* while playing a *virtual boxing game* with her son. (ECF No. 53-5). That injury is "simply too remote and too attenuated from the earlier use of a motor vehicle to permit a finding that the causal connection between the [February 2020] injury and the [2024] accident 'is more than incidental, fortuitous, or 'but for.''" *McPherson*, 493 Mich. at 98.

In her response brief, Palmer failed to even mention *McPherson* or *Kovach* and did not otherwise meaningfully address the issue at hand. Instead, she asserted basic and vague "denials" of the enumerated paragraphs of Allstate's motion, and provided the following "additional response to Allstate's position regarding Ms. Palmer's hip fracture in July 2024":

> In July 2024, Ms. Palmer sustained a hip fracture while visiting her son, Lee Macko. She was hospitalized at Hurley Medical Center. Following Ms. Palmer's hospitalization, she returned to Charter Senior Living. Ms. Palmer's pre-hospitalization condition, i.e. that she was paralyzed and had cognitive limitations, did not change. Ms. Palmer continued to need monitoring, 24/7 safety and supervision, and

17

> ongoing care. As set forth by Dr. Mukhi, Ms. Palmer's limitations are anticipated to be lifelong conditions. *See* **Ex. 3, 4, 5**. As such, the care received at Charter Senior Living (From August 2024 to January 2025) was necessary for her care and rehabilitation related to the January 29, 2020 motor vehicle accident.
>
> \* \* \*
>
> **Allstate is obligated to pay for Dawn Palmer's residency after the July 2024 hospitalization, where the residence at Charter continued to be as a result of the January 29, 2020 motor vehicle accident.**
>
> Prior to her July 2024 hospitalization, Dawn Palmer was a resident of Charter Senior Living, where she was receiving ongoing medical monitoring, care, and services. These were allowable expenses related to her injuries from the January 29, 2020 motor vehicle accident. While she broke her hip while visiting her son in July of 2024, doing so did not change the fact the [sic] she continued to need services from Charter related to her traumatic brain injury and paraplegia. Indeed, whether she had suffered the hip injury or not, Ms. Palmer would have had to remain at Charter Senior Living – Davison to receive 24/7 supervision and safety monitoring. Allstate is obligated to pay for the allowable expenses related to her residence at Charter, where those expenses were a result of the January 29, 2020 motor vehicle accident.

(ECF No. 56, PageID.1319, 1323-24) (emphasis in original).

In this regard, the parties seem to be talking past one another a bit. Allstate's request at least facially appears to be focused on care "as a result of the July 29, 2024 hip fracture," whereas Palmer appears to focus more broadly on the "allowable expenses related to her residence at Charter" that were "as a result of the January 29, 2020 motor vehicle accident," but *incurred after* her July 29, 2024 hip fracture.[10] The two are not mutually exclusive,

---

[10] Palmer apparently had good reason for her approach to Allstate's request because, at oral argument, Allstate seemed to take a broader position than it had previously espoused. That is, Allstate seemed to argue that, in light of its view that Palmer required no care immediately prior to her July 29, 2024 fall, it was really arguing that *any care* she required after that fall would necessarily be attributable only to that fall. As discussed herein, at least on the present record, the

18

and the Court will address both issues separately.

First, Palmer presents no evidence, and makes no argument that her July 2024 fall "ar[ose] out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle," MCL 500.3105(1), and the Court has no qualms finding that, under *McPherson* and *Kovach*, that fall did not so arise, and that Allstate is therefore not liable under that statute for the *medical care* Palmer required that was *directly attributable* to that fall, such as the ambulance ride to the hospital and the hip surgery. However, for all of the reasons discussed above, the Court finds that factual questions remain – and that more discovery is warranted – as to the care Palmer needed after the July 2024 fall for injuries "arising out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle" in connection with the 2020 accident.

Accordingly, **IT IS ORDERED** that Allstate's motion for summary judgment **(ECF No. 53)** is **GRANTED** to the extent it seeks a declaration that Allstate does not have a statutory obligation under the No-Fault Act to tender payment for medical treatment and care related *directly* to Dawn Palmer's July 29, 2024 fall. However, **IT IS ORDERED** that Allstate's motion is **DENIED WITHOUT PREJUDICE** to the extent Allstate seeks a broader declaration that it has no statutory obligation under the No-Fault Act to tender payment for *any* of Palmer's "residency" or "medical treatment and care" after her July 29, 2024 fall.

---

Court declines to make such a finding.

*Palmer's Motion to Amend the Scheduling Order (ECF No. 55)*

In her motion to amend the scheduling order, Palmer requests an additional 120 days to conduct discovery. (ECF No. 55). At the hearing, however, her counsel indicated that only 90 days was needed.

Under Fed. R. Civ. P. 16(b)(4) a court's scheduling order "may be modified only for good cause and with the judge's consent." For the reasons stated on the record and above, the Court finds that Palmer established good cause for the requested additional period of discovery. Accordingly, **IT IS ORDERED** that Palmer's motion to amend the scheduling order **(ECF No. 55)** is **GRANTED**. All discovery shall be completed by **February 2, 2026**. The parties shall participate in a mediation as ordered by the Court, and in the event the case does not resolve through that process, the Court will set a dispositive motion deadline at that time.

Dated: October 31, 2025　　　　　　　　s/David R. Grand
Ann Arbor, Michigan　　　　　　　　　DAVID R. GRAND
　　　　　　　　　　　　　　　　　　United States Magistrate Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on October 31, 2025.

　　　　　　　　　　　　　　　　　　s/Julie Owens
　　　　　　　　　　　　　　　　　　JULIE OWENS
　　　　　　　　　　　　　　　　　　Case Manager